SUPREME COURT. Broome General Term, January, 1863. *Balcom, Campbell, Parker* and *Mason*, Justices.

## HARVEY DONE, plaintiff in error, *v.* THE PEOPLE, defendants in error.

Section 25 of title 1, ch. 1, part IV of the Revised Statutes (2 *R. S.*, 659), which provided that "the punishment of death shall, in all cases, be inflicted by hanging the convict by the neck until he be dead," was only declaratory of the common law as it existed at the time of the enactment; and the repeal of that section by the act of 1860 (*ch.* 410), left the common law mode of inflicting punishment of death by hanging, in full force and effect.

For a murder committed in December, 1860, the prisoner was indicted in February, 1861, and tried in April, 1862, and found guilty, and the court gave judgment that the prisoner "suffer the punishment of death prescribed by law for murder in the first degree, and that he be imprisoned in the State prison at Auburn until such punishment be inflicted." On error the judgment was affirmed.

*Held*, also, that the judgment was not defective in omitting to sentence the prisoner to confinement *at hard labor*. A sentence to confinement in the State prison is necessarily a sentence of imprisonment at hard labor, the statute having prescribed that mode of punishment.

It is only in the case of conviction in the Court of General Sessions of the city of New York, brought up by writ of error, that the appellate court may grant a new trial without any exception having been taken in the court below. Since the amendment of the act of 1855 by the act of 1858, no such power exists in cases of conviction in the Courts of Oyer and Terminer.

A judgment will not be reversed because the court permitted the prosecution to prove the confession of the prisoner to the officer, while under arrest, as to the place where he had secreted money, it appearing that the money was found at the place designated by him.

On a trial in 1862 for a murder alleged to have been committed in December, 1860, the judge, among other things in his charge to the jury, said, "that the governor had refused to issue any warrant for execution under the statute; that he had been advised by the Court of Appeals, in the present state of the law, it was inexpedient to do so," and afterwards said to the jury, "that they had nothing to do with the question of punishment which followed their verdict of conviction of murder; that that belonged to the law, and not to them to decide;" to which an exception was taken. *Held*, that no error was committed available to the prisoner.

THE prisoner was indicted at the February term of the Madison Oyer and Terminer, 1861, for the murder of Calvin Burton, in the town of Sullivan in the county of Madison, on

the 29th day of December, 1860, and was arraigned and pleaded not guilty. He was tried at the Madison County Oyer and Terminer, on the 7th day of April, 1862, before Mr. Justice MASON and SIDNEY T. HOLMES, county judge, and the justices of the Sessions.

Upon the trial, the prosecution introduced, among other witnesses,

*Edwin C. Frederick,* who testified as follows: I·was present at Watkins' tavern when Done, the prisoner, was arrested; it was at Chittenango depot; it was about noon on Thursday, January 3d, 1861; Thomas A. French and I arrested him; we came from the village of Chittenango to Watkins direct; French was a constable; I had been one, but was not then; I went to help French arrest Done; we went into the bar-room; French inquired for Done; Done was in, eating his dinner; he boarded there; in two or three minutes he came out, and we arrested him; we took him up stairs to his room; before going up stairs, French or I asked him what he had done with those bills he had offered to pass to Mr. Curtis.

The district attorney here offered to prove the prisoner's confessions, and what he said about the bills on this occasion.

The prisoner's counsel here asked leave to examine the witness preliminarily, and the witness being examined preliminarily by the prisoner's counsel, to ascertain if the confession was voluntary, testified:

When French arrested the prisoner, he told him that he arrested him for the murder of Calvin Burton, and he, prisoner, answered, "it is all right;" he did not act much excited.

The prisoner's counsel here objected to the offer of the district attorney, on the grounds:

1st. That the confessions of the prisoner, while under the arrest for the charge of murder, were not admissible.

2d. That it is not shown that they were voluntarily made.

3d. That they were drawn out by the officer who arrested him.

4th. It appears they were obtained by questions put to the prisoner by the officer who arrested him, or those who aided

the officer in making the arrest, and had him in charge at the time and while under arrest, and therefore were not voluntarily made.

5th. They were made under an excitement and agitation of the prisoner's mind while under arrest, and by questions propounded by the officers and those aiding in his arrest.

The objections were overruled by the court, and the answers, statements and confessions of the prisoner were allowed to be given in evidence, to which decision the prisoner's counsel excepted.

The witness then testified: I asked what he had done with the bills he had offered to Mr. Curtis? The prisoner said the bills were up stairs in his trunk; we three then went up stairs into the prisoner's bedroom; he took out the key to his trunk and unlocked it; we made a thorough search; we searched his trunk and the clothing in the trunk, and his clothes in this room, and in his room searched his bed and bed clothes; we could not find the bills; I said to Done, " it is singular what has become of them if you put them in your trunk yesterday ; " I asked him if any one else had had the key to his trunk? He said "no." We then came down stairs and got in the cutter, and took him up to Chittenango, a distance of two miles, for examination ; after we had started, we spoke to him again on the subject of his losing those bills, and where they had gone to, and we asked him if he had not been somewhere to spend the money.

The prisoner's counsel here objected to the answers the prisoner gave in reply, for the reasons before stated. The objections were overruled by the court, and the prisoner's statements and reply were allowed to be given in evidence, to which decision the prisoner's counsel excepted.

*A.* He said, " Come to think, I have; I passed the bill with a hole in it at Bassett's hotel at Manlius Station, a few days previous." I asked him to whom ? He said to a boy, Charles Reels, who lived with Mr. Bassett. I asked him if he was sure it was Charles Reels? He said he was. I asked him where he was ? He said the boy was in the bar. I asked

him where he got the bills? He said in Albany, and then he said, or on the canal.

We took the prisoner to Esquire French's office in Chittenango; I then went to Bassett's hotel, Manlius, and found Charles Reels; he is fifteen years old; I took the boy to Esquire French's office in the front room; the prisoner was in the back room; I went in and asked Done if he thought he should know the boy.

The prisoner's counsel here objected to the reply the prisoner then made, and the statements and confessions of the prisoner on that occasion, for the reasons above stated, which objections were overruled by the court, and the reply and statements allowed to be given in evidence, to which ruling and decision the prisoner's counsel then and there duly excepted.

The witness testified: Done said, "Yes;" I opened the door and took the Reels boy in the room; Done was in; I asked him if this was the boy; he said, yes; I saw him about noon at Bassett's hotel in Manlius. The reply which the boy Charles Reels made to Done, was then offered in evidence, which was objected to as incompetent and immaterial, by the prisoner's counsel.

The court decided that no answers to questions propounded by Fredericks and any third person, standing between Reels and the prisoner, were admissible, but that any voluntary conversation between Reels and Done upon that subject might be given, and the answer was excluded, but the witness was allowed to testify as follows:

Done said he was at Manlius depot between 10 and 11 A. M., and saw Reels there, and Reels replied, I was not there that day over half an hour, and that was between 12 and 1 P. M.; I was at school that day; Done said in reply to that, I think that is the boy I passed the bill to; Done said he passed the bill to Reels for a cigar.

The counsel for the prisoner in due time objected specifically to what Reels said, and the whole evidence as above given was allowed to be given, and the prisoner's counsel excepted.

*Joseph H. Dayhash* sworn for the People and testified, among other things : I know the prisoner; I kept grocery in the same building where he boarded ; I was present at the examination before Esq. French; it lasted two days; at the end of of the first day's examination, while in the office, I asked the prisoner if he could tell what he had done with the two bills he had offered a few days before to Curtis.

The prisoner's counsel objected, for the reasons above stated, to the reply and confessions of the prisoner. The objections were overruled, to which decision the prisoner's counsel excepted.

The witness testified : Done said he could not; I told him that it was singular to me that he had offered those two $2 bills to Curtis a day or two before, and now could not tell what he had done with them ; he said he could not; I told him I thought he could, and he had better have the truth come out about the bills; this was about 5 o'clock and we were getting ready to go home to tea; some one said Done wanted to see me; I came up to him, he put his head up to mine, and Done told me to go and search his bedroom, and every part of it, and you may look under the carpet; he told me not to leave a spot unturned.

The prisoner's counsel in due time made a general objection to all these confessions, on the grounds above stated in Frederick's evidence, but did not make specific objections to the confessions, on the ground that they were elicited by reason of hope or favor, or that it would be better for him to confess. The evidence was allowed, and the prisoner's counsel excepted.

John Case and I then went to Done's room at Watkin's Hotel and examined said room ; we found a bunch in the carpet, and put my hand on it, and I took hold of the end next to the wall and slipped it up, and we saw some change there, and one bill; the change ($3.32) in 3c., 5c., 10c. pieces, and 2 or 3 cents and one old Spanish shilling ; this was the pile next; the first bill was a safety-fund bill of Boston, or New York; the next, about a foot from this, we found a $2.00 bill on the Globe Bank of New York and $1.00 Oneida bill;

Done *v.* The People.

this carpet did not come to within six inches of the wall, and was just a strip that run along beside his bed; there was nothing standing over this money; I came right there and saw that bunch on the carpet; I took the bills to Esq. French's office; I wrote my name on the backs of these two bills at French's office; these are the two bills; this looks to me like the change I found under the carpet.

All of the foregoing statements and confessions of the prisoner, which were objected and excepted to, as set out in this bill of exceptions, were material and prejudicial to the prisoner on the trial of said indictment.

At the close of the evidence, the presiding judge charged the jury, among other things, as follows:

He read to the jury the sections 2 and 4 and 5 of the act of the legislature of the State of New York, passed 14th April, 1860, chapter 410, defining the crime of murder, and said that the act had been read to the jury by the counsel in summing up, and different views had been expressed by them in regard thereto.

That this act still seemed to retain the punishment of death for murder in the first degree. The statute was one of doubtful construction, that while it seemed to retain the death penalty for murder in the first degree, it had repealed the provisions of the statute in regard to the mode and manner of executing the same. That it was questionable whether it was lawful to inflict the punishment of death under the statute. That the governor of the State had refused to issue any warrant for execution under the statute; that he had been advised by the Court of Appeals, in the present state of the law, it was inexpedient to do so. That if the prisoner at the bar should be convicted of murder in the first degree, the court would impose the sentence that the prisoner suffer the punishment of death, and that in addition, he be imprisoned in the State prison until such punishment should be inflicted.

That whether the execution of such sentence would ever be inflicted, rested with the governor.

The court further charged the jury, that they had nothing

to do with the question of punishment which followed their verdict of conviction of murder; that that belonged to the law and not to them to decide.

The prisoner's counsel in due time excepted to that part of the charge wherein the court stated that the governor had refused to issue his warrant for execution, and also to that part of the charge that the Court of Appeals had advised the governor it was inexpedient in the present state of the law to issue his warrant of execution.

The jury found the prisoner guilty.

The prisoner, by his counsel, then moved an arrest of judgment, upon the ground that the sentence provided for by chapter 410 of the Laws of 1860, defining the crime of murder and the punishment thereof, could not be executed.

That the act of 1860 repealed the mode of punishment in cases of murder, provided by the Revised Statutes, and that the act of 1861 has repealed the act of 1860, so that the prisoner cannot be sentenced for the crime of murder in first degree, as his rights were fixed under the act of 1860.

Also, that it is unlawful for the court to pass any judgment against the prisoner.

Also, that if the court should sentence the prisoner under the act of 1860, it would be unlawful to execute said sentence.

Also, that by the laws of the land no sentence or judgment against the prisoner can be made or executed in this case or upon this conviction.

The motion was overruled by the court, to which the prisoner's counsel excepted.

The court gave judgment that the prisoner suffer the punishment of death prescribed by law for murder of the first degree, and that he be imprisoned in the State prison at Auburn until such punishment be inflicted.

The record was then removed by writ of error to this court.

*David J. Mitchell*, for the plaintiff in error.

I. The court erred in allowing the People to prove the confessions of the prisoner, made to French and Fredericks at the

Done *v.* The People.

time of his arrest, in regard to the bills alleged to have been offered Curtis by the prisoner, and in overruling the objection of the prisoner's counsel thereto.

1. Before any confession or statement made by a prisoner can be received in evidence on a criminal case, it must be shown to have been *entirely voluntary.* The burthen of proof upon this point lies with the prosecution. (*Rex* v. *Swatkins,* 4 *Carr. & Payne,* 548; *The People* v. *McMahon,* 15 *N. Y. R.,* 385; *Best Prin. of Ev.,* 418; 1 *Greenl. Ev.,* §§ 193, 219, 225, 226; 5 *Cush. R.,* 605, 610.)

*a.* The prisoner's confessions were not voluntary. He was arrested upon the charge of murder, informed of the charge, and immediately sharply questioned by the officers who made the arrest, in regard to the bills and where they were. (*Wilson's Case,* 1 *Holt,* 597; *The People* v. *Hartung,* 4 *Park. Cr. R.,* 323; *The People* v. *McMahon,* 15 *N. Y. R.,* 385, 386; 11 *Vermont R.,* 116; 1 *Mass. R.,* 144; *United States* v. *Nott,* 1 *McLean R.,* 499.)

*b.* The prisoner had just been arrested and charged with the murder of Burton, and whether guilty or innocent, must have been under great excitement and agitation. His statements drawn from him then were not admissible. (4 *Park. Cr. R., supra; Commonwealth* v. *Knapp,* 9 *Pick. R.,* 496; 15 *N. Y. R., supra,* 386, 387.)

*c.* Immediately upon the prisoner's arrest he is taken by the officers to his room, and compelled to help search for the bills. He is sharply rebuked by the officer because they are not found in his trunk, and then questioned by the officer. It is submitted that statements thus extorted are not voluntary within the definition adopted in *The People* v. *McMahon.*

*d.* The case of *The People* v. *Rodgers* (18 *N. Y. R.,* 9) in no wise conflicts with this rule as claimed by the prisoner here; in that case the confession was in no manner extorted by the officers.

II. The court erred in allowing the People to prove the conversations that passed between the prisoner and Reels.

1. The prisoner was then under examination for murder.

Done *v.* The People.

He was suddenly confronted by both the officers and Reels, and was compelled, by direct questions from the officer, to enter into a discussion with Reels.

2. It is submitted to be clear that the statements there and thus drawn out did not proceed from the "spontaneous suggestions of the prisoner's own mind, free from the influence of any extraneous disturbing cause." (*The People* v. *McMahon, supra.*)

III. The court clearly erred in allowing the witness, Dayhash, to testify to the previous statements made to him in regard to searching the room and looking under the carpet.

1. These statements were drawn out of the prisoner by Dayhash, while the prisoner was under the distress and excitement of an examination charged with murder.

2. They were obtained under a direct promise and strong inducements held out by Dayhash. He says, I told him I thought he could tell, and he had better have the truth come out about the bills. (*Taylor's Case*, 5 *Cush. R.*, 605, 610.)

One of the objections to this evidence was, that the statements were not voluntarily made; this was clearly sufficient.

IV. The confessions and statements of the prisoner allowed to be proved in this case, were, it is submitted, allowed directly against the spirit of the law.

1. The law abhors any and every attempt to compel a man to be the instrument of his own conviction. (*Ward's Case*, 15 *Wend. R.*, 231; 1 *Greenl. Ev.*, § 225, 226.)

V. The court erred in charging the jury, that the Governor of the State had refused to issue any warrant for execution under the statute, and he had been advised by the Court of Appeals, in the present state of the law, that it is inexpedient to do so.

1. The direct effect of this charge was, to lead the jury to a verdict of guilty upon much less evidence than they would have required in the absence of the charge.

2. It was calculated to make the jury unanimous in their opinion that a verdict of guilty was of no more importance to the prisoner, than a conviction of any ordinary felony.

3. This was error. The law requires more evidence and

Done *v.* The People.

greater certainty to warrant a conviction in a capital case, than one of lesser magnitude or in civil cases. (3 *Greenl. Ev.*, § 29.)

4. Suppose the court had charged the jury that no sentence or judgment could be inflicted upon the prisoner upon a conviction, and then immediately upon the return of a verdict of guilty, gave judgment of death against the prisoner, can there be any doubt that the charge would be erroneous? It is believed that, in principle, no difference exists between the supposed case and the one at bar.

5. The subsequent portion of the charge, that the jury had nothing to do with the question of punishment, does not cure the error. The fatal effect upon the prisoner was as certain with the subsequent portion of the charge as without it. It in no manner tended to remove from the minds of the jury the injury done to the prisoner by that portion of the charge complained of.

6. If the charge might have injured the prisoner wrongfully, he is entitled to a new trial. (24 *Wend. R.*, 419; 19 *Id.*, 232; 6 *Hill R.*, 292; 13 *Barb. R.*, 42.)

VI. It was equally erroneous for the court to charge the jury, "that it was questionable whether it was lawful to inflict the punishment of death under the statute."

1. This part of the charge being erroneous, the prisoner is entitled to a new trial, although no exception was taken thereto on the trial. (*Laws* 1855, 613; *The People* v. *McCann*, 16 *N. Y. R.*, 60.)

VII. The court erred in giving judgment against the prisoner, and in overruling the prisoner's motion in arrest of judgment.

1. By the statute of 1860, which was in force at the time the alleged offense was committed, there was and is no court or officer authorized to determine the manner in which the sentence of death can be executed, or the mode of death that may lawfully be inflicted. (*Laws of* 1860, *ch.* 410.)

2. The only law applicable to this case does not provide for the sentence of death. It provides that certain offenses shall

not be punished with death. The most that can be said is, that the act of 1860 presupposes that other sections existed whereby murder in the first degree was punished by death by hanging. But all those statutes were repealed. There is no punishment for murder in the first degree provided by law. (2 *R. S.*, 935, § 1, 5*th ed.; People* v. *Hartung*, 22 *N. Y. R.*, 95, 107.)

3. That under said law the officer to whose discretion the manner of executing the sentence may be submitted and determined, may direct that a cruel and unnatural punishment of death may be inflicted, and there could be no legal mode of reviewing that determination by writ of error or otherwise, or by a stay of proceedings. (*N. Y. Const.*, *art.* 1, § 5; *U. S. Const.*, *art.* 8, *amendments; People* v. *Hartung*.)

. 4. The said law substitutes the arbitrary discretion of some unknown officer or tribunal for the certainty which is required by the Constitution and laws, and introduces a new, unusual and uncertain punishment; and, therefore, the law under which the judgment was given was in violation of, and wholly unauthorized by, the Constitution of the United States and the Constitution of the State of New York.

5. It cannot be argued that when the legislature repealed the provision of the Revised Statutes which provided that the punishment for murder should be by hanging the person by the neck until he should be dead, in such case the person committing the crime could be put to death in the manner prescribed by the common law.

" When the legislature repealed that section of the Revised Statutes, without substituting anything as to the execution of a capital sentence in its place, they necessarily determined that it should no longer be obligatory for the court, by its judgment, or the executive officers, in the performance of their duties, to resort to that method of inflicting the punishment. (2 *R. S.*, *marg.* 701, § 16, 3*d ed.*, 788; *The People* v. *Hartung, supra.*)

6. No valid legal sentence or judgment of any kind can be inflicted upon the prisoner in this case. It would involve a

great legal absurdity to hold that a court could give judgment of death against the prisoner, when it could judicially see that the ministerial officer would be guilty of murder if he executed the same.

VIII. It cannot be claimed that this judgment is valid so far as it tends to imprison the defendant, although void wherein it declares death.

1. Such a construction would be against the whole spirit of the act of 1860. It was not the intention of that statute to imprison for life, but for one year, and that construction would convert the act of 1860 into an act to imprison for life for the crime of murder. Clearly, such was never the intention of the legislature.

2. This is one entire judgment upon writ of error brought, though the judgment be erroneous in part only, it must be wholly reversed. (5 *Metc. R.*, 530.)

3. There is no power to sentence to imprisonment under section 4 of the act of 1860, because that act provides that such a sentence can be inflicted only when a person shall be convicted of any crime punishable with death. That punishment as we have before seen was abolished.

IX. The judgment of the court is erroneous. It provides that the prisoner suffer the punishment of death, and be imprisoned in the State prison at Auburn, till such punishment be inflicted.

1. This judgment is wholly unauthorized by law. The statute of 1860 provides that he "shall at the same time be sentenced to confinement and *hard labor* in the State prison until," &c., &c.

2. The judgment given is in effect a sentence to solitary confinement, and is more severe than a sentence in conformity to the act. (*People* v. *Hartung, supra.*)

The court should, therefore, as the judgment is unauthorized and erroneous, reverse the judgment and discharge the prisoner.

This court cannot give a new judgment against the prisoner, nor send the case back to the Oyer and Terminer for a proper

judgment. (*King* v. *Bourne,* 7 *Ad. & Ell. R.,* 58; *Shepherd* v. *Commonwealth,* 2 *Metc. R.,* 419; *Christian* v. *Com.,* 5 *Id.,* 530; *King* v. *Ellis,* 5 *Barn. & Cress. R.,* 395; *Phillips* v. *Berry,* 1 *Ld. Raym. R.,* 5; *The People* v. *Taylor,* 3 *Denio R.,* 91, 97; *Miller* v. *Finkle,* 1 *Park. Cr. R.,* 374.)

X. The indictment in this case, is invalid.

1. It charges the offense of murder as it existed at common law, although such crime was abolished by the act of 1860, and a new definition of the crime substituted therefor.

2. It charges the offense of murder as it was defined by the Revised Statutes, although such offense had been abolished by the act of 1860.

3. It wholly omits in any count to charge that the prisoner was indicted for the crime of murder in the first degree.

*A. N. Sheldon* (District Attorney), for the People.

I. The mere fact of the prisoner being in custody at the time the confessions were made, is not a ground for the exclusion of this evidence. (*People* v. *Rogers,* 18 *N. Y. R.,* 9; *Hartung* v. *People,* 4 *Park. Cr. R.,* 319; *People* v. *McCollister,* 1 *Wheel. Cr. Cas.,* 392; *People* v. *Thayer,* 1 *Park. Cr. R.,* 595.)

II. There is no evidence tending to show fright or excitement, but on the contrary, at the time the prisoner was arrested, he said, "it is all right, and did not act much excited." The prisoner talked freely with Reel, and called Dayhash to him and made a voluntary request. And there is not a word of evidence in the case showing fright or excitement.

III. Fright, excitement or agitation of a prisoner's mind consequent upon the fact of an arrest having been made, where no threats or inducements have been held out, will not exclude evidence of confessions. (*Lamb's Case,* 2 *Leach Crim. C.,* 625.)

Because it is assumed in law that a mere arrest, or, which is the same thing, the mere fact of custody, produces fright, excitement or agitation of the mind of the prisoner, then, when the Court of Appeals decided, in the *People* v. *Rogers,*

Done v. The People.

that the mere fact of the prisoner being in custody at the time of making declarations is not sufficient to exclude them," the court by this decision necessarily covered the whole ground; that any effect upon the prisoner which the law would deem to have been produced by the mere fact of the prisoner being in custody would not render the evidence incompetent. When the court adjudicated the legal effect of the *fact* of custody, the decision comprehended all the consequences which the law would ascribe to, or presume to result from that fact. The fact of arrest or of custody is one of law, and its legal results and effects are constituents of the fact itself — are elements of a *legal condition* upon which the court decided.

IV. The law does not infer any disturbing effects from fear, excitement or agitation of the prisoner's mind, produced by an arrest, sufficient to exclude voluntary confessions.

Thus, in *People* v. *Thomas* (3 *Park. Cr. R.*, 256), the Court of Appeals held that " where a prisoner *on his arrest* confessed his guilt, the evidence was competent, notwithstanding the prisoner was in an excited state of mind at the time of making it," and on page 260, DEAN, Justice, says : The fear was produced by the arrest, but it has never been held that admissions thus made were not admissible.

In *Ward* v. *People* (3 *Hill R.*, 396; *S. C.*, 6 *Id.*, 145), the court held that where an officer told the prisoner that the matter could not be settled and immediately arrested him, his confessions were competent.

In *Hartung* v. *The People*, Judge HOGEBOOM says ( 4 *Park. Cr. R.*, 323), the circumstance that a party was at the time under arrest, is not sufficient to exclude the evidence. (*Regina* v. *Owen*, 9 *Carr. & Payne R.*, 83 ; *State* v. *Clark*, 2 *Bailey R.*, 66 ; *Thurston's Case, in Joy on Confessions*, 13 ; 1 *Moody Cr. C.*, 27 ; *Commonwealth* v. *Mosher*, 4 *Burr. R.*, 464 ; *Rex* v. *Jane Richards*, 5 *Carr. & Payne R.*, 318 ; *Rex* v. *Derrington*, 2 *Id.*, 418 ; *People* v. *McCollister*, 1 *Wheeler Cr. C.*, 392 ; *Stephen* v. *State*, 11 *Ga. R.*, 225 ; *Rex* v. *Thornton*, *Ry. & Mood Cr. C.*, 27 ; *Phillipps Ev.*, 110.)

V. A confession will not be rejected merely because it was

PAR.—VOL. V.      48

made in answer to questions which assumed the prisoner's guilt. (*State* v. *Clarissa,* 11 *Ala. R.,* 58; *Com.* v. *Knapp,* 9 *Pick. R.,* 496, 500–510; *State* v. *Grant,* 32 *Maine R.,* 171; *State* v. *Potter,* 18 *Conn. R.,* 166; *People* v. *Smith,* 3 *How. Pr. R.,* 216, 230; *People* v. *Smith,* 1 *Wheeler Cr. C.,* 54; 2 *Stark. Ev.,* 52, *notes; Swatkin's Case,* 4 *Carr. & Payne R.,* 548, *found in* 19 *Eng. Com. Law R.,* 520.)

But the questions did not assume guilt or suggest an answer. The answers were entirely *voluntary.*

VI. The true rule is to exclude *only* those confessions which may have been procured by the prisoner being led to suppose that it would be better for him to admit himself to be guilty of an offense which he really never committed. (*Rex* v. *Court,* 7 *Carr. & Payne R.,* 486.)

The test is whether the inducement was calculated to make the confession an untrue one. (*Rex.* v. *Thomas,* 7 *Carr. & Payne R.,* 345.)

These cases are approved in *Russell on Crimes* (2d vol., 826), and sanctioned by this court in 3 *How. Pr. R.,* 230.)

Free and voluntary confessions are the highest evidence of guilt. (*State* v. *Jefferson,* 3 *Ired. R.,* 418; *Campbell* v. *The State,* 23 *Ala. R.,* 44; *Commonwealth* v. *Knapp,* 10 *Pick. R.,* 477; *Morgan* v. *The State,* 11 *Ala. R.,* 289.

In the case at bar, there is no evidence to show these confessions were not free and voluntary.

VII. But it cannot be claimed that these confessions were not voluntary, because the bill of exceptions states that the prisoner's counsel "did not make specific objections to the confessions on the ground that they were elicited by reason of hope or favor, or that it would be better for him to confess."

VIII. The prisoner's counsel obtained permission and examined the witness, Fredericks, fully, to show, if he could, that the confessions were not voluntary. It was for the prisoner to bring his confession within the exception. (*Commonwealth* v. *Knapp,* 9 *Pick. R.,* 496, 500–510.)

IX. The court held that only voluntary conversation between Reels and the prisoner was admissible. Here the court erred

if at all, in favor of the prisoner. 1. Because the declarations of third persons assented to by prisoner were competent. (*Commonwealth* v. *Call*, 21 *Pick. R.*, 515; *State* v. *Perkins*, 3 *Hawkes R.*, 377; *State* v. *Welch*, 7 *Port. R.*, 263; *Berry* v. *The State*, 10 *Ga. R.*, 511.) 2. The People are entitled to prove all that was said at the time by any person, which explained or gave point to the language of the prisoner. (*United States* v. *Tardy*, 1 *Peters C. C. R.*, 458.)

X. The rule, in excluding confessions, has been carried too far, and "justice and common sense have too frequently been sacrificed at the shrine of mercy." (1 *Greenl. Ev.*, 284; *note*.)

XI. A motion, in arrest of judgment, is confined to objec tions which arise on the face of the record itself. (1 *Archb. Cr. Pr. and Pl.*, 671, *note by Waterman;* 2 *R. S.*, *3d ed.*, *p.* 741, §§ 16, 22; *Ingle* v. *Coolidge*, 2 *Wheat. R.*, 363; *Suydam* v. *Williamson*, 20 *How. U. S. R.*, 427; *Whart. Cr. Law*, 3043.)

Should it not have been brought up by *certiorari?* (*People* v. *Cancemi*, 18 *N. Y. R.*, 128.)

Can this "speech of the prisoner," outside the record, be reviewed on this writ of error, which brings up only the bill of exceptions? (*Freeman* v. *The People*, 4 *Denio R.*, 21; *Wynehamer* v. *The People*, 2 *Park. Cr. R.*, 382; *People* v. *Stockham*, 1 *Id.*, 426.)

XII. This murder was committed the 29th December, 1860, when the new act of that year was in effect.

1. The question, then, is: Was murder punishable as an offense in the year 1860?

2. Previous to the act of 1860, the highest penalty known to the law, was inflicted for the crime of murder. That the legislature intentionally left this horrid crime without a punishment, is not contended; but that the legislature unintentionally provided no punishment for the crime, is contended. The argument is, then, that the prisoner should go free, not because of the intention, but because of the unintention of the legislature.

3. But the act of 1860 did not leave the crime without a punishment. The first section of the act declares the punish

ment for murder in the first degree to be death. The fourth section declares "that any person convicted of any crime punishable with death," shall be "sentenced to suffer such punishment" of death. Also, "at the same time, be sentenced to confinement at hard labor in the State prison until such punishment of death be inflicted." The statute therefore provides two sentences to be pronounced at the same time; 1st, "be sentenced to suffer" death; 2d, "at the same time to be sentenced" to State prison, &c. Now, if this is construed as one sentence, still the parts are independent and harmonious. Because, if the sentence to suffer death cannot be carried out, the sentence "to confinement at hard labor in the State prison until such punishment of death shall be inflicted," may be carried into effect without infringing in the least with the literal reading of the other portion of the sentence.

4. Now, how can it be said that there is no punishment for murder when the act expressly provides a punishment which can be inflicted, to wit, imprisonment in the State prison.

5. "The act places the convict at the mercy of the governor in office at the expiration of one year, and all his successors during the lifetime of the convict." (8 *Smith*, 106, *per* DENIO.)

XIII. At the time this act was passed, by an express section of the statute, "to suffer death by execution" was to suffer death by hanging.

By all law language, both in the statute and in the reports, in the mouth of the courts and in the mouth of the profession, by public usage, by popular sense, at the time this act was passed, the words to suffer death by execution, by universal use and consent, meant to suffer death by hanging. And this known, definite, legal and popular meaning, as old as the earliest judicial records of the State, should be given to the language of this act. We argue, then,

1. That the evident intent of this act is, that the person "sentenced to suffer the punishment" of death, should suffer such punishment by "execution."

Done *v.* The People.

The intention of the legislature is the law. (*Tonnele* v. *Hall*, 4 *Comst.*, 140.)

"The intention of a statute is sometimes to be collected from the cause or necessity of making it." (*Tonnele* v. *Hall*, *supra.*)

"What is within the intent is within the letter, and such a construction should be put on a statute as does not suffer it to be eluded." (*People* v. *Utica Insurance Company*, 15 *Johns. R.*, 358, 380; *Johnson* v. *Bush*, 3 *Barb. Ch. R.*, 207.)

"In construing a statute the whole shall be taken and effect given to every part." (*Commonwealth* v. *Alger*, 7 *Cush. R.*, 53, 89; *Ferman* v. *City of New York*, 5 *Sandf. R.*, 16.)

2. Statutes in *paria materia* are to be consulted for a construction of each other; and this rule includes statutes which have expired or have been repealed. (*Sedg. on Stat.*, 250, citing *Rex* v. *Loxdale et al.*, 1 *Burr. R.*, 447; *Reg.* v. *Merionethshire*, 6 *Q. B. R.*, 343; *Reg.* v. *Stock*, 8 *Ad. & Ell. R.*, 405, 410; *Bussey* v. *Story*, 4 *Barn. & Ald. R.*, 98, 108.)

*a.* The word "execution," in the Revised Statutes, is equivalent to the words "hanging the convict by the neck."

3. The word "execute," when used in reference to a judicial sentence pronounced against a party convicted of murder, technically, in law language, and popularly, means death by hanging, according to the custom in this State from the earliest times.

4. The rule of strict construction to penal statutes does not interfere with the above positions.

"This rule has in modern times been so modified or explained away as to mean little more than that penal provisions, like all others, are to be fairly construed according to the legislative intent as expressed in the enactment." (*Sedg. on Stat.*, 326 to 334, citing 4 *Mass. R.*, 473; 14 *Peters R.*, 464; 2 *Peters R.*, 358; 5 *Foster N. H. R.*, 247; 12 *N. H. R.*, 255; 13 *Johns R.*, 498; 6 *Cow. R.*, 290; 17 *Mass. R.*, 359, 362; 8 *Pick. R.*, 370, 374; 3 *Sumner R.*, 209, 211, 212; 1 *Paine's R.*, 33, 34.)

In *King* v. *Inhabitants of Hodnett* (1 *T. R.*, 96, 101), the

word "master" in an enactment was construed to include "mistress."

In *Schooner Nymph* (1 *Sumner R.*, 516, 518), where "trade" was held to include "cod fishery."

XIV. The punishment of murder at the common law was by hanging the offender by. the neck until he should be dead. The statutory provision declaring that the punishment of death should be thus inflicted, was consequently in affirmance of the prescription of the common law. (8 *Smith*, 107, *per* DENIO.)

Now, does the repeal of the twenty-fifth section of the statute abrogate the .common law? We say not, because the repealing act recognizes the "death penalty," and an "execution" of it, and the common law comes to the aid of the new act, and regulates the manner of execution.

*By the court*, CAMPBELL, J. The prisoner, Harvey Done, was tried and convicted at the Madison County Oyer and Terminer, in April, 1862, of murder in the first degree, and was sentenced to "suffer the punishment of death prescribed by law, and that he be imprisoned in the State prison at Auburn until such punishment be inflicted." Before sentence, the counsel for the prisoner moved in arrest of judgment, on the ground that the sentence provided by the act of 1860, defining the crime and punishment of murder, could not be executed; that the act of 1860 repealed the mode of punishment as provided in the Revised Statutes, and that the act of 1861 repealed the act of 1860, so that the prisoner cannot be sentenced for the crime of murder in the first degree, as his rights were fixed under the act of 1860; that it was unlawful for the court to pass any judgment against the prisoner; that if the court should sentence the prisoner under the act of 1860, it would be unlawful to execute the sentence, and that by the laws of the land, no sentence or judgment can be made or executed in this case: — all and each of which points were overruled, and counsel excepted. The murder of which the prisoner was convicted was committed in December, 1860, after the passage of the act of that year. The punishments in England, when the offender was to suffer death, were

Done v. The People.

inflicted in various ways. Under the directions of military courts he was shot. When condemned by ecclesiastical tribunals, he was not unfrequently burnt at the stake, as if his priestly judges designed that the heretic, on going out of this world, should have a foretaste of the punishment to which they also consigned him in the next. For treason against the state the great sword of justice was to fall. The condemned man was sentenced to be hung, taken down while still alive, beheaded, disemboweled and quartered; with few exceptions, however, the axe of the executioner only was used, and the criminal was simply beheaded. If, however, in case of high crimes, especially treason, the prisoner stood mute and refused to plead, he might be sentenced to be pressed to death, a punishment inflicted by placing the prisoner on his back, naked, in a cold dungeon, with his arms and legs extended by cords to the four corners, and with iron or stone laid on his breast, and then left till death from cold, or pressure, or exhaustion, came to his relief. Lastly, for the crime of murder and numerous other felonies, the criminal was sentenced to be hung by the neck till he was dead. In New York we had no conviction, so far as I am informed, of any person charged with heresy. In 1705, during the administration of Lord CORNBURY, the Rev. Francis McKemie was indicted and tried in the city of New York, for preaching without the Queen's (Anne) license. The trial was not in an Ecclesiastical Court, but in the Supreme Court. McKemie was a Scotch Presbyterian, and he defended himself, maintaining with marked ability that preaching the gospel was no crime at the common law; and the jury, notwithstanding the marked partiality of the court against him, rendered a verdict of acquittal. A few years prior to that, Colonel Nicholas Bayard and Alderman John Hutchings were tried, also, in the city of New York, on indictments for high treason. Both were convicted and sentenced to be hung, emboweled and quartered. They were among the most eminent citizens in the province of New York, and their trial and conviction were, as they had often been in England, the fruit of party rancor and judicial cor-

ruption. The sentences were afterward reversed by directions
sent out from the English government. With the exception
of the trials of Leisler and Milbourne, both of whom were
convicted and executed by hanging, these, I believe, were the
only trials for treason in New York while a province. The
extreme punishment of emboweling and quartering was never
inflicted. Of burning at the stake we have several melancholy
instances, none, however, for heresy. This punishment was
inflicted, so far as I have been able to ascertain, upon oppressed
and despised races. Thus, in 1707, Lord CORNBURY, gov-
ernor, in writing to the Board of Trade in London, says, that
"a most barbarous murder has been committed upon the
family of one Hallet, by an *Indian* man slave and a negro
woman," and he adds, "I immediately issued a special com-
mission for the trial of them, which was done, and the man
sentenced to be hanged and the woman burnt, and they have
been executed."

In 1712, Robert Hunter, then being governor of New York,
in writing to the Board of Trade, among other things, speaks
of a slave insurrection and the killing of several whites by
the negroes. He says, the slaves were arrested and "forth-
with brought to their trial before the justices of this place,
who are authorized by act of assembly to hold a court in
such cases. In that court were twenty-seven condemned,
whereof twenty-one were executed; one being a woman with
child, her execution by that means suspended; some were
burnt, others hanged, one broke on the wheel, and one hung
alive in chains in the town; so that there has been the most
exemplary punishment inflicted that could possibly be thought
of." He might well have added, as he did, "which only this
act of assembly could justify" (*See vol.* 5, *Colonial His., pp.* 39,
341.) In 1741–42, there occurred what has become historically
famous in this State as the negro plot, wherein love of freedom
in the negro, introduction of popery, incendiarism and plunder
are combined. Thirteen blacks were burnt at the stake, and
one white man and one negro were gibbeted. (*See pamphlet con-
taining trial, and Smith's History of New York, vol.* 2, *pp.* 70–72.)

Done *v.* The People.

About 1772, or 1773, a negro man was burned at the stake in Johnstown, then the county seat of Tryon county, for a rape committed on a white woman. There may be other instances, but those mentioned are enough to require in the bill of rights that neither "cruel nor unusual punishments shall be inflicted," and also in the Constitution of 1777, to call for the declaration that "freedom of profession and religious worship should be allowed in this State to all mankind," and that the principles of rational liberty required us to "guard against the intolerance wherewith wicked priests and princes have scourged mankind." I have run over this brief outline history of the punishment of death for crimes anterior to the Revolution, for the purpose of showing that there was a cause for the declarations in the bill of rights, and, also, as it tends to shed light on the subsequent legislation in relation to capital punishment in our State. It will be seen, that under that legislation the punishment of death must be inflicted by hanging, and that burning at the stake, quartering and disemboweling, breaking on the wheel and gibbeting alive, would no longer be allowed, whether the power to do so was derived from colonial acts, from the common law, or whether the condemned parties were Indians, negroes or white men. Our bill of rights had declared that neither unusual nor cruel punishments should be inflicted. Burning at the stake, if it had not been an unusual, was a cruel punishment, so was breaking on the wheel, and so was gibbeting alive. All these punishments had been inflicted while New York was an English province. The Revised Statutes of the State declared that "punishment of death shall in all cases be inflicted by hanging the convict by the neck until he be dead." (*Title* 1, § 25, *ch.* 1, *part* 4, *Concerning Crimes and Punishments.*) The 16th section, in title 7 of the same chapter, and part, declares that "all punishments prescribed by the common law for any offense specified in this chapter, and for the punishment of which provision is herein made, are prohibited." When the act of 1860 repealed section 25 there was no punishment prescribed for murder in that first chapter, nor in any other part of the statutes. The

prohibition no longer extended to the punishment prescribed by the common law for that crime. But the punishment which the common law prescribed was precisely the same as declared by section 25, above quoted. The condemned man was hung by the neck till he was dead. Hanging by the neck was the general mode by which capital punishment was inflicted. The other modes were the exceptions. "If a statute makes any new offense felony, the law implies that it shall be punished with death, viz., by hanging." (*Jacob's Law Dic.*, title *Felony, and citing Hawkin's P. C.*, 1, ch. 41 *and* §§ 4, 12, ch. 48.) The act of 1860 starts in the first section with the declaration that "no crime hereafter committed, except treason and murder of the first degree, shall be punished with death in the State of New York." The 2d section defines what is murder in the first degree. There is no declaration in the act in positive terms that such murder shall be punished with death, though the whole act would seem to proceed upon that assumption. Such affirmative declaration, in my judgment was not necessary. The crime of murder was well known and understood. It commenced with the history of our race, and has accompanied it in all ages, and will probably continue as long as human passions exist.

The punishment has been various among different nations. But in England, throughout her entire history, in the province of New York and in the State of New York, the punishment has always been inflicted by hanging the criminal by the neck. (See English State Trials, commencing in the fourteenth century, in which it will be found that in every case of simple murder the sentence was that the prisoner be hung by the neck.) Of course I do not refer to the killing of a husband by the wife, or a master by the servant or slave, which constituted what was termed petit treason, nor to the acts of assembly for punishment of negroes, already referred to, but murder, as generally understood and defined, and what the legislature must have understood by the term when they enacted the law of 1860. Unless, then, we hold that the repeal of section twenty-five, of the chapter and title of

the statutes above referred to, also repealed and made null and of no effect the rule of the common law which prescribed the punishment for murder, then this prisoner, who was found guilty of murder in the first degree, should suffer the punishment of death, and that punishment should be inflicted by hanging by the neck till he is dead. As to sections twenty-four and twenty-five, the original note of the revisers was: "The last two sections are new; possibly such would be the present law, but it is so doubtful that it is deemed highly important to declare it." So far as section twenty-five declares what is the mode of punishment of the crime of murder, that is by hanging, I apprehend there could not have been doubt, but as to other crimes, especially treason, there was unquestionably grave doubt. But if section twenty-five simply declared the law, its repeal does not of itself render the law which it declared null and void. In my judgment, therefore, when the act of 1860 repealed section twenty-five, it left the common law mode of inflicting punishment by death, namely, by hanging, in full force and effect, and when this prisoner was sentenced to suffer the punishment of death prescribed by law, he was virtually sentenced to be executed in the mode which the common law required, by hanging by the neck till he was dead. Prior to the act of 1860, the court, when a convict was sentenced to the punishment of death, was required to make out and sign and deliver to the sheriff a warrant stating the conviction and sentence, and "appointing the day on which such sentence shall be executed." (§ 11, *title* 1, *ch.* 1, *part* 4, *R. S.*) Now, by the act of 1860 the convict is not to be executed "until a warrant shall be issued by the governor, under the great seal of the State, directed to the sheriff of the county in which the State prison may be situated, commanding the said sentence of death to be carried into execution." If the act gives to the governor the power, by implication or otherwise, to issue his warrant for the execution of the prisoner, that warrant would fix the time, and doubtless should specify the mode of the execution the same as is pointed out by the common law. But whether the power is given or not, it is

not necessary for us to determine. The court did all that it was required, and all it could do, when it pronounced the sentence that the prisoner should suffer the punishment of death, and be imprisoned till such punishment be inflicted. If, by reason of a defect in the law, the governor may not have to order his execution, or if, for any other reason, his punishment shall be virtually commuted to imprisonment for life, the prisoner has no cause or right to complain. He committed the crime when the act of 1860 was in full force. He was found guilty of murder in the first degree. A part of the sentence required by that act is, that he be imprisoned until the "punishment of death shall be inflicted." If we are right in the . view that the punishment of death by hanging still remained in full force under the common law after the repeal of section twenty-five by the act of 1860, then the sentence of imprisonment may be carried out; because, even if the governor have the power of ordering the execution of the prisoner, he may never see fit to issue his warrant for that purpose. He may thus virtually allow the punishment of death to be commuted for imprisonment. It would only be under the supposition that there was no longer any punishment by death for the crime of murder, and therefore the prisoner could not be sentenced to suffer that punishment, that the ground could be maintained that the imprisonment was but an incident to the death punishment, and therefore must fall with it, so that virtually if there was no law for the sentence that the prisoner should suffer the punishment of death, he could not even be imprisoned. Such was the result that the counsel for the prisoner contended for on the argument in this case.

But, in my opinion, the imprisonment would be legal and right if the punishment of death remains,. even though the governor may not feel authorized, under the act of 1860, to issue his warrant for the execution of the prisoner. The nice question which arose in *The People* v. ·*Hartung* (22 *N. Y. R.*), is not in this case. In that, as to Mrs. Hartung, the act of 1860 was passed after the offense had been committed, and it

was held that the provision for imprisonment in the State prison was as to her *ex post facto* and void, and it was on that ground chiefly, if not entirely, as I read the opinion of the Court of Appeals, that the judgment in that case was reversed and a new trial ordered.

The counsel for the prisoner also contends that the sentence or judgment is unauthorized, because the act of 1860 provides that the prisoner shall be sentenced to confinement and hard labor, and that, in the present case, the sentence is only imprisonment in the State prison, and, therefore, it is more severe than the act authorizes, as it amounts to a sentence to solitary confinement. I think a sufficient answer to this is, that the general statutes in relation to State prisons in this State regulate the matter. The 126th section, page 1093, 3d volume, 5th edition, is as follows : All convicts in a State prison other than such as are confined in solitude, shall be kept constantly employed at hard labor during the day time, except when incapable of laboring by reason of sickness or bodily infirmity." Now, by section 131, page 1094, same volume, it will be seen, that in order to enforce discipline and secure entire submission and obedience, the warden of the prison may confine a convict in a cell, and retain him there until he shall be reduced to such submission and obedience. Hard labor is the rule of the State prison in this State. Solitary confinement is a mode of discipline. I am not aware of any case in which the sentence to the State prison condemns the prisoner to solitary confinement. By section 56, page 980, 3d volume, 5th. edition, it will be seen, that where any person shall be convicted of an offense punishable by imprisonment in a county jail, the court "may sentence such person to be confined in a solitary cell, but such imprisonment shall, in no case, exceed thirty days in the whole." The sentence of the prisoner to confinement in the State prison was necessarily a sentence of imprisonment at hard labor. The law regulating our State prisons determines it and makes the sentence definite and certain in that respect. Were it otherwise, I do not think we could say that the punishment was more severe. The grave controversy which once

arose as to whether solitary confinement entirely, or solitary confinement at night, with hard labor with others during the day, and which divided the opinions of the friends and promoters of prison reform, had reference rather to the reformation of the prisoner, than to the severity of his punishment. Whether solitary confinement was the most severe punishment, would depend much upon the habits and temperament of the prisoner, and still more on the manner in which it was enforced. Confinement in a dark and loathsome dungeon is one thing; in an airy and ventilated apartment another. The better opinion now prevails, generally, in this country, and has, I believe, become settled conviction in this State, that solitary confinement, at night, and labor in classes during the day, is best, on the whole, for the State, and best for the criminal. As remarked, however, before, the sentence of imprisonment is a sentence to hard labor, as thus understood, labor in classes during the day, and solitary confinement at night, and this only varied when disobedience or disorderly conduct requires solitary confinement and short allowance of food to be resorted to as a part of the discipline of the prison. I do not think the objection as to the sentence in words not stating that the prisoner was to be kept at hard labor, well taken.

On the trial, certain statements made by the prisoner after his arrest, were given in evidence, under the prisoner's objection, but there were no specific objections "on the ground that they were elicited by reason of hope or favor, or that it would be better for him to confess." The act of 1855 was amended, chapter 330, Laws of 1858, striking out "from the Court of Oyer and Terminer of this State," so that it is only in case of trials in the Court of General Sessions in the city of New York, brought up by writ of error, that the appellate court may now grant a new trial, whether any exceptions shall have been taken or not in the court below. But apart from this, even if we should review the matter, I do not think the statements amounted to a confession. The prisoner simply indicated a spot where they might search for the bank bills inquired

Done *v.* The People.

about. Further search was made and the bills were found. They were found under a piece of carpet in the prisoner's room. This fact could undoubtedly have been given in evidence, no matter under what circumstances the statement had been made by the prisoner — I mean the fact of finding the bills.

In *The People* v. *McMahon* (15 *N. Y. R.*, 386), Judge SELDEN, speaking of confessions not voluntary, such as do not proceed from the spontaneous suggestion of the party's own mind, free from the influence of extraneous disturbing causes, says that the confession is excluded, "because it is in its nature unreliable, and not on account of any impropriety in the manner of obtaining it, and that in this all the authorities agree." In this case, so far as the prisoner gave information or intimated where the bills might be found, he was confirmed by other witnesses. As said by *Phillipps* (*vol.* 1. *p.* 116), "that part of his confession in which he has described a particular spot, or the place where the goods were concealed or deposited, would be inadmissible, unless confirmed afterward by the proof of finding them there." In the case at bar, there was that precise confirmation. In the case of *The People* v. *McMahon*, it must be borne in mind that the question arose as to the statements of the prisoner before the coroner's jury, made under oath. I do not think this case shows, so far as we have the evidence, any serious disturbing causes operating on the mind of the prisoner, which should cause an exclusion of a confession, even if he had made one. But, as remarked, the statement which he did make, confirmed as it was by other witnesses who found the bills in the indicated place, was clearly admissible. (*Cow. & Hill's notes to Phill. Ev., note* 226, *part* 1.) In the note this language is used : "There is a strong current of authority running with the text, that both the disclosure and the fact or circumstance connected with and going to its construction, shall also be received in evidence, and they go to the jury with their joint force." This disposes of the only question which can be material, arising out of the admission or rejection of evidence on the trial.

There was one exception to a portion of the charge, as follows: "The prisoner's counsel, in due time, excepted to that part of the charge wherein the court stated that the governor had refused to issue his warrant for execution, and also to that part of the charge that the Court of Appeals had advised the governor that it was inexpedient, in the present state of the law, to issue his warrant of execution. It was insisted by the counsel for the prisoner, that the direct effect of the charge was to lead to a verdict of guilty upon less evidence than the jury would have required in the absence of the charge. We cannot say whether this is so or not. Generally it may be true, that an intimation given or opinion expressed by the judge as to the guilt or innocence of the prisoner, may have an effect upon the jury. Sometimes, owing to peculiar circumstances, it may be the duty of the judge to give an intimation, or at all events to so present the salient points of a case as to show the inclination of his own mind. But if, as in this case, he leaves fully and fairly the whole question to the jury, it is not error. The judge, after stating a fact that was notorious in the State, that the governor had not issued his warrant under the law of 1860, and that the Court of Appeals had advised that it was inexpedient, instructed the jury that "they had nothing to do with the question of punishment which followed their verdict of conviction of murder, that that belonged to the law and not to them to decide." There was certainly no error in law in this part of the charge. The most that could be said was, that it was the statement of irrelevant matter. The judge, in effect, said that to the jury himself, when he told them that they had nothing to do with the question of punishment. But however that may be, and even though the statement may have an influence on the jury, I do not see that there was any error in law. The whole matter having been submitted to the jury, they were told that their verdict had nothing to do with the question of punishment. That belonged to the law and not to them to decide.

The conviction and judgment of the Oyer and Terminer should be affirmed.